IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GANNON LASSEIGNE,

    Plaintiff,

v.

MICHAEL S. PIWOWAR[1], as Acting
Chairman of the Securities and
Exchange Commission,

    Defendant.

CIVIL ACTION FILE NO.

1:14-cv-3156-TWT-CMS

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion for Summary
Judgment. (Doc. 84). For the reasons that follow, I **RECOMMEND** that the
motion be **GRANTED**.

## I.    PROCEDURAL BACKGROUND

On October 1, 2014, Plaintiff Gannon Lasseigne filed this action against his
current employer, the Securities and Exchange Commission ("SEC") alleging
violations of the Americans with Disabilities Act, the Rehabilitation Act of 1973,

---

[1]    Michael S. Piwowar was designated Acting Chairman of the U.S. Securities
and Exchange Commission on January 23, 2017. Pursuant to Federal Rule of Civil
Procedure 25(d), Michael S. Piwowar is hereby substituted for former Chairman
Mary Jo White as the defendant in this suit.

and the Privacy Act. (Doc. 1). He subsequently filed a 54-page Amended Complaint, alleging that while working at the SEC, "he was discriminated and retaliated against based upon his participation and opposition to the discrimination of a fellow employee" and that the SEC subjected him to a hostile work environment. (Doc. 29 ¶ 2). He also alleges that the SEC violated his privacy rights and created a hostile environment by conducting improper background investigations into his suitability for federal employment. (Id. ¶¶ 174-181). The Amended Complaint contains a variety of allegations of wrongdoing, and Defendant moved to dismiss all the claims alleged therein. (Doc. 30).

In ruling on the motion to dismiss, the Court significantly narrowed the issues, dismissing all variations of Plaintiff's retaliation claim except one. (Docs. 45, 57). The Court concluded that Plaintiff had stated a plausible claim for retaliation by alleging in Paragraphs 164 and 165 of the Amended Complaint that he made written complaints between November 2, 2012 and December 26, 2012 about unlawful conduct, and that the SEC retaliated against him by giving him a negative performance review on February 6, 2013. (Doc. 45 at 14-15; Doc. 57). The Court dismissed Plaintiff's hostile work environment claim and Plaintiff's "retaliation due to association" claim. (Doc. 45 at 15-17; Doc. 57). The Court

denied the motion to dismiss the Privacy Act claim (Doc. 54 at 17-19; Doc. 57), but Plaintiff has since abandoned that claim.[2]

Thus, Plaintiff's sole remaining claim is one for retaliation based on his allegations that Defendant gave Plaintiff a negative performance rating in retaliation for Plaintiff's having made written complaints of unlawful conduct between November 2 and December 26, 2012. This claim is brought pursuant to the anti-retaliation provisions of the Rehabilitation Act of 1973, 29 U.S.C. § 791. Defendant has filed a motion for summary judgment, which is now fully briefed. (Docs. 84, 90, 91). On March 16, 2017, the parties presented oral argument on the motion.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden

---

[2] Plaintiff did not defend the Privacy Act claim in response to Defendant's motion for summary judgment, and during oral argument, Plaintiff's counsel confirmed that Plaintiff has abandoned that claim. Accordingly, I recommend that Defendant's motion for summary judgment on Plaintiff's Privacy Act claim be **GRANTED AS UNOPPOSED**.

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; Fed. R. Civ. P. 56(e). "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.   FACTS

In light of the foregoing summary judgment standard, the Court finds the following facts for the purpose of resolving Defendant's motion for summary judgment only.

### A.   Background Facts

In June 2011, while Plaintiff and his co-worker Carole Solloway were

working for the SEC, Ms. Solloway asked for permission to telework, as an accommodation for a medical condition. (Lasseigne Dep. [Doc. 84-2] at 8-9, 60-61; Dignam Dep. [Doc. 88] at 9-10, 19-21). Thereafter, Ms. Solloway made a formal EEO complaint regarding perceived disability discrimination. (Dignam Dep. at 8-9; Lasseigne Dep. at 58). In late 2011, Plaintiff became an active supporter of Ms. Solloway's efforts to obtain a medical accommodation, by attending meetings in support of Ms. Solloway and by lodging complaints about how the SEC was treating Ms. Solloway. (Lasseigne Dep. at 58-71). In September 2012, Ms. Solloway signed an EEO Investigative Affidavit in which she identified Plaintiff as a witness.[3] (Doc. 89-2 at 58, 89-90, 92, 96-97).

In 2012, Plaintiff became the subject of at least two work-related investigations, one brought by the Office of Personnel Management ("OPM") and the other brought by the SEC's Office of Human Resources ("OHR"), but Plaintiff suffered no disciplinary action as a result of either investigation. (Lasseigne Dep. at 24-27).

---

[3]     Carol Solloway later filed a lawsuit in this Court against the SEC alleging disability discrimination. See Solloway v. White, No. 1-13-CV-3827-TWT. This Court entered summary judgment in favor of the SEC on all of Ms. Solloway's claims on March 27, 2017.

**B.      Protected Activity: Plaintiff's Complaints in Late 2012**

On November 2, 2012, Plaintiff sent an email to Deborah Shaw, his union representative, stating:

> I am a witness in an EEO case, that amongst other issues, is related to acts of discrimination, retaliation, workplace hostility.  Through anonymous communications, it has come to my attention that because of this EEO case, the associated issues, and named persons, there is a knowing, willful, and intentional campaign on the part of the Agency and related parties to "target," attack and discredit me professionally and personally with the intent to stifle and/or eliminate me (by any means), so as to prevent me from potentially being an EEO witness. It is my understanding that this constructive campaign and character assault is primarily being executed by way of an "OHR Management Inquiry" and interrelated OPM Inquiry, prompted by a purported "anonymous" tip, and disingenuously coordinated with various regional and national managers . . . .

(Lasseigne Dep. Ex. 11 [Doc. 84-4] at 1-2).  Plaintiff sent a similar email to Rebecca Pikofsky, an SEC human resources employee.  (Id. at 3-4; Lasseigne Dep. at 65-66).  On November 10, 2012, Plaintiff sent another email to Ms. Pikofsky, again reiterating that he considered himself to be a "target" of an attack aimed at discrediting him and complaining that "Staff were/are being bullied, coerced, and intimated as part of the collective parties' attacks . . . .  Sponsoring a pervasive culture of intimidation, retaliation, and hostility is unacceptable."  (Lasseigne Dep. Ex. 11 [Doc. 84-4] at 9).

On November 13, 2012, Plaintiff forwarded the emails that he had previously sent to Ms. Pikofsky to, among others, Rhea Dignam, his third-level supervisor. (Lasseigne Dep. Ex. 11 [Doc. 84-4] at 22-28). Plaintiff sent similar emails to other SEC employees, including an email dated December 24, 2012 to the SEC's Interim Inspector General stating that the SEC had "improperly exercised [its] authority by executing a retaliatory investigation/inquiry and 'targeting' me for being an 'employee,' EEO witness, whistleblower, etc.," and describing the investigation as a "witch hunt." (Id. at 82-90). There is no evidence that Anthony Russell, Plaintiff's immediate supervisor, was aware of these emails or of the complaints contained therein.

## C.     Adverse Action: Plaintiff's 2012 Performance Appraisal

Before Plaintiff sent the above-mentioned emails, Plaintiff's immediate supervisor, Anthony Russell, began working on his team's 2012 performance appraisals, covering the period from October 1, 2011 through September 30, 2012. (See Doc. 89-6). The SEC's performance review process involved a "calibration committee" process intended to provide a forum for managers to talk about the group's performance to make sure that they were being consistent in their application of the SEC's standards and objectives. (Russell Dep. [Doc. 84-6] at 13). Mr. Russell testified that the first step in the calibration process is for each

supervisor to set the rating for each staff member and to complete the narrative portion of the evaluation; the supervisor then shares those items with the members of the calibration committee. (Id. at 29-31). The calibration committee would then meet and discuss the proposed rating to evaluate it for consistency and make changes if necessary. (Id. at 30-31). The final step was to forward the results to two supervisors, Askari Foy and Rhea Dignam, as part of the office-wide calibration process. (Id. at 30).

On November 1, 2012, Mr. Russell sent an email to his calibration committee stating that he was sending his "draft write-ups" and his "initial calculations," and Russell copied Mr. Foy on the email. (Doc. 89-6 at 1-7). Attached to the email was a memorandam from Mr. Russell with the subject line "Mid-year performance narrative for Gannon Lasseigne for the period October 1, 2011 through September 30, 2012." (Id. at 4-7). The memo addressed five "Objectives" and four "Competencies." (Id.). Under Objective 5, Mr. Russell stated that Plaintiff had behaved in an "unacceptable" manner by, among other things, sending derogatory emails to managers, becoming irate when asked to use polite words, and yelling at a manager. (Id. at 6).

Six days later, on November 7, 2012, Mr. Russell sent Mr. Foy and the members of the collaboration committee a "ratings spreadsheet." (Doc. 89-5).

That spreadsheet lists several items of information including the employee name, grade, position title, as well as numerical ratings for five "Objectives," four "Standards," and a "Final Rating." (Id. at 2). The last column on the spreadsheet is titled "Acceptable/Unacceptable." (Id.). Plaintiff's information is on the last row of the spreadsheet, and it contains, among other things, a "1" in the "Objective 5" column and "Unacceptable" in the last column. (Id.).

On February 6, 2013, Defendant provided Plaintiff with a document titled Performance Work Plan ("PWP") that identifies the Rating Official as "Anthony D. Russell." (Doc. 84-6 at 197-204). Part 2 of the PWP identifies five Performance Objectives and contains ratings for each:

Objective 1: Effectively collaborates with management to organize and plan examinations in support of the SEC's goal of identifying potential risk factors and appropriate exam focus areas.
Rating: Needs Improvement

Objective 2: Efficiently and effectively researches, gathers and analyzes information and documents concerning Registrants' business operations to determine compliance with federal securities laws and regulations and develop a recommendation pertaining to internal control weaknesses and/or violations of SEC and/or other applicable rules and regulations.
Rating: Meets Expectations

Objective 3: Accurately and effectively prepares examination reports, deficiency letters, work-papers and supporting documentation to support conclusions reached during the examination; documentation is completed within the agreed upon timeframes.
Rating: Needs Improvement

Objective 4: Appropriately analyzes and follows up with responses to deficiency letters and makes appropriate recommendations to managers within agreed upon timeframes; as directed, supports referrals to enforcement and other regulators.
Rating: Meets Expectations

Objective 5: Coordinates the examination team and facilitates an efficient and thorough process by communicating with the team, including managers, to provide information needed to complete tasks and adapt to changing conditions.
Rating: Unacceptable.

(Doc. 84-6 at 198-199). Because Plaintiff received an "unacceptable" rating in Performance Objective 5, Plaintiff automatically received an "unacceptable" overall rating and became ineligible for a merit pay increase.[4] (Lasseigne Dep. at 37; Russell Dep. at 22).

On February 12, 2013, Russell sent Mr. Foy an email stating that he was sending the "narrative" for Plaintiff. (Doc. 89-7). Attached to that email is a

---

[4] Part 3 of the PWP is titled Performance Standards, and Plaintiff was rated "unacceptable" in the "interpersonal skills" standard. (Doc. 84-6 at 200-202). The PWP provides the following "competency definition" of the term Interpersonal Skills: "Shows respect, courtesy and tact when working with others; develops and maintains positive working relationships; may include effectively dealing with individuals who are distressed; relates well to people from varied backgrounds in different situations; is sensitive to individual diversity." (Id. at 200). It does not appear that the "unacceptable" rating in the interpersonal skills performance standard caused Plaintiff to lose any benefit. Both parties have focused on the Part 2, Objective 5 "unacceptable" rating as the basis for Plaintiff's ineligibility for a merit pay increase.

memorandum from Mr. Russell with the subject line "Performance narrative for Mr. Gannon Lasseigne for the period October 1, 2011 through September 30, 2012." (Id. at 2-5). The memo closely resembles the memo that Russell sent to the calibration committee on November 1, 2012, in that it addressed five "Objectives" and four "Competencies." (Id.) Slight changes were made to parts of the memo to remove some of the more positive comments. (Compare Doc. 89-6 [memo sent on November 1, 2012] at 3-7 with Doc. 89-7 [memo sent on February 13, 2013] at 2-5). For example, a statement concerning Objective 1 indicating that Plaintiff had communicated well with his teammates was removed from the later memo. (Id.). The portion of the memo addressing Objective 5, however, is virtually identical[5] to that section of the previous memo, with Mr. Russell stating in both memos that Plaintiff had behaved in an "unacceptable" manner by, among other things, sending derogatory emails to managers and yelling at a manager. (Id. at 4).

On February 28, 2013, Mr. Russell sent Plaintiff a Memorandum with the subject line "Notice of Performance Improvement Plan," that noted the

---

[5] With regard to the portion of the memo addressing Objective 5, the earlier version of the memo referred to Plaintiff by his first name, "Gannon," while the later version called him "Mr. Lasseigne." The earlier version of the memo talked about the need for Plaintiff to use "please and thank you," while the later version of the memo indicated that Plaintiff needed to use "polite words." (Doc. 89-6 [memo sent on November 1, 2012]; Doc. 89-7 [memo sent on February 13, 2013]).

"unacceptable" rating in Objective 5 and stated that pursuant to the collective bargaining agreement, Plaintiff was being placed on a 90-day performance improvement plan.  (Doc. 84-6 at 192-196).  The memo also provided specifics about why Plaintiff's performance was deemed unacceptable in connection with Objective 5, pointing to the following three incidents: (1) an "unproductive" email exchange on June 4, 2012 with Plaintiff's then Examination Manager, Robert Cowdin; (2) Plaintiff acting in a "defensive and argumentative" manner in response to Mr. Russell's instructions about being polite when requesting database searches from colleagues; and (3) an incident on August 3, 2012 in which Plaintiff asked his managers to contact another regional office and later acted in a "disrespectful manner." (Id. at 193).

Plaintiff did not receive a merit pay increase in 2012, but he did receive a merit pay increase in 2014, 2015, and 2016.  (Lasseigne Dep. Ex. 9 [Doc. 84-3] at 27-37).

## IV.   DISCUSSION

Because Plaintiff is a federal employee, his retaliation claim relating to disability discrimination are addressed under the Rehabilitation Act, which "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability."  Mullins v. Crowell, 228 F.3d 1305, 1313

(11th Cir. 2000). Claims brought under the Rehabilitation Act are governed by the same standards as those brought under the Americans with Disabilities Act. Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).

The Rehabilitation Act incorporates the anti-retaliation provision from the ADA and prohibits retaliation based on the fact that an individual "testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this chapter," and makes it unlawful to intimidate or interfere with any individual on account of his "having aided or encouraged any other individual in the exercise or enjoyment of any right granted or protected by this chapter." 42 U.S.C. § 12203(a), (b). See Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 245 (11th Cir. 2011) (unpublished). "This anti-retaliation provision is similar to Title VII's prohibition on retaliation." Id. (citing Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997)). Accordingly, Plaintiff's retaliation claim under the Rehabilitation Act is evaluated under the same framework used for Title VII retaliation claims. Id.

Where, as here, a plaintiff asserts a retaliation claim based on circumstantial evidence, courts employ the familiar McDonnell Douglas burden-shifting model. Burgos-Stefanelli, 410 F. App'x at 246. To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected

activity; (2) he suffered an adverse employment action; and (3) there was some causal relationship between the two events.  Id.  Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer who must proffer a legitimate, non-retaliatory reason for the adverse employment action.  Id.  If the employer offers such a legitimate reason for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation.  Id.

Defendant does not dispute that the emails Plaintiff sent in November and December 2012 complaining that he was a target amount to protected activity.  Nor does Defendant dispute that the negative performance rating and resulting loss of a 2012 merit pay raise amount to an adverse action.  Rather, Defendant argues that Plaintiff has failed to establish a prima facie case of retaliation because he has not shown a causal connection between the protected activity and the adverse action.  (Doc. 84 at 5-8).  Alternatively, Defendant argues that even if Plaintiff could make out a prima facie case of retaliation, Defendant is still entitled to summary judgment because Plaintiff has failed to create a fact issue as to pretext.  (Id. at 12-16).  I will address these arguments in turn.

## A.  <u>Prima Facie</u> Case

Defendant first argues that Plaintiff's retaliation claim fails as a matter of law because Plaintiff cannot make out the causation prong of the <u>McDonnell Douglas</u> prima facie case.  Defendant argues that Plaintiff has failed to come forward with evidence to show a causal connection between protected activity (Plaintiff's complaints in the November and December 2012 emails) and the adverse employment action (the "unacceptable" rating for Objective 5 in the 2012 PWP with the resulting loss of a merit pay raise).  According to Defendant, Plaintiff's claim fails because there is no evidence that Anthony Russell, the person who rated Plaintiff in the PWP, was aware of any of Plaintiff's emails when he made the decision to assign the "unacceptable" performance rating.

To establish the requisite "causal link," a plaintiff must establish that the decision maker was "actually aware of the protected expression at the time it took adverse employment action."  <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993).  When the defendant is an entity, rather than an individual, "the plaintiff must show that the [entity's] agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action."  <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1197 (11th Cir. 1997).  Thus, to survive the SEC's motion for summary

judgment, Plaintiff must present evidence that the person who took the adverse action against him was actually aware of his protected activity at the time the person took the adverse employment action.  See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

Defendant argues that Mr. Russell was the sole decision maker, and that Mr. Russell had no knowledge of Plaintiff's complaints of discrimination or retaliation in November and December 2012.  (Doc. 84 at 8-10).  According to Defendant, it is impossible for Mr. Russell's employment actions to have occurred with some retaliatory motive when Mr. Russell had no knowledge of Plaintiff's relevant EEO activity.  (Id. at 10).

In response, Plaintiff makes three arguments.  First, Plaintiff argues that Mr. Russell was aware that Plaintiff engaged in protected activity.  (Doc. 90 at 14).  Alternatively, Plaintiff argues that even if Mr. Russell was not aware of the protected activity, Russell's supervisor, Rhea Dignam, was the actual decision maker, and she was aware of the protected activity because Plaintiff forwarded one of his emails to her.  (Id. at 15-16).  Finally, Plaintiff argues that other actions

taken in Ms. Solloway's case amount to protected activity, that Foy and Dignam were aware of those other actions, and that Foy and Dignam were the actual decision makers. (Id. at 14-17). As discussed below, none of these arguments has merit.

### 1. *Evidence of Russell's awareness of the protected activity*

Plaintiff argues unpersuasively that Mr. Russell was aware of Plaintiff's "protected activity" by citing to incidents that occurred in 2011 and July 2012. (Doc. 90 at 14). Such activities lack sufficient temporal proximity to create a jury issue regarding causation. The only protected activities in which Plaintiff engaged that are sufficiently close in time to the negative performance appraisal are the complaints Plaintiff made in the emails in November and December 2012. It is undisputed that Mr. Russell was not the recipient of any of the emails that Plaintiff sent during that time period, and Plaintiff has come forward with no evidence to suggest show that Mr. Russell was aware of those emails or of Plaintiff's complaints. A decision maker cannot have been motivated to retaliate based on something unknown to him. While Mr. Russell's awareness could be established by circumstantial evidence, Plaintiff has failed to do so. See Rudy v. Walter Coke, Inc., 613 F. App'x 828, 830 (11th Cir. 2015) (holding that "[t]emporal proximity alone does not establish a causal connection when there is unrebutted evidence that

the decisionmaker was not aware of the protected activity" in the context of an FMLA retaliation claim); <u>Meyer v. Sec'y, U.S. Dep't of HHS</u>, 592 F. App'x 786, 793 (11th Cir. 2014) (unpublished) (affirming summary judgment on a retaliation claim under the Rehabilitation Act for failure to show more than mere temporal proximity where the employer had completed the investigation that lead to the employee's termination before the employee engaged in protected activity). Because Plaintiff failed to show a triable issue of fact with regard to Mr. Russell's awareness of Plaintiff's protected activity, this theory is insufficient to survive Defendant's motion for summary judgment.

### 2. *Dignam's participation in the 2012 Performance Appraisal*

Plaintiff next argues that Ms. Dignam was a decision maker who was aware of November and December 2012 emails. (Doc. 90 at 15-16). To show that Ms. Dignam was a decision maker, Plaintiff points to Ms. Dignam's signature on Plaintiff's 2012 PWP (Doc. 84-6 at 197) and to Mr. Russell's sworn statement that Ms. Dignam "participated in" the evaluation (<u>id.</u> at 4, ¶ 15).

While Ms. Dignam was a recipient of at least some of the emails at issue, the evidence in the record shows that she did not receive Plaintiff's emails until November 13, 2012, nearly two weeks after Mr. Russell had put forth his draft recommendation that Plaintiff be rated "unacceptable" in Performance Objective 5.

(Doc. 89-6 at 1-7; Doc. 84-4 at 22-28). Moreover, there is no evidence that Ms. Dignam had any input into the decision to rate Plaintiff as "unacceptable" or that she contributed to the content of the review in any way.[6] The only evidence before the Court on this topic is that Mr. Russell set the rating, and that it remained unchanged throughout the process.

Finally, Plaintiff points to certain changes that were made to the narrative portion of the draft PWP between November 1, 2012 (when Mr. Russell provided the first draft of the narrative portion of the performance appraisal to the calibration committee) and February 6, 2013 (when the final version was provided to Plaintiff). Plaintiff points out that some of the more positive comments were removed and argues that Ms. Dignam (who was aware of Plaintiff's protected activity as of November 13, 2012) could have been the person who made the changes. This argument, however, ignores several undisputed facts in the record. First, none of the substantive changes to the narrative portion of the review relate to issue Performance Objective 5. (Compare Doc. 89-6 [memo sent on November 1, 2012] at 3-7 with Doc. 89-7 [memo sent on February 13, 2013] at 2-5). Second, there is no evidence that the narrative portion of the rating—much less any particular changes thereto—had any effect on whether Plaintiff received his merit

---

[6] Plaintiff did not depose either Ms. Dignam or Mr. Foy.

19

pay increase. Third, Mr. Russell testified, without contradiction, that he alone determined the "unacceptable" rating, and that he did so before he received any input from the calibration committee or anyone else. Mr. Russell's testimony is bolstered by the emails, which show that the first (and only) person to suggest that Plaintiff receive an "unacceptable" rating was Mr. Russell. Fourth, the rating that Mr. Russell proposed to the calibration committee on November 1, 2012 remained unchanged throughout the review process, even if there were slight modifications made to some part of the narrative portion of the review. Simply put, there is no evidence that Ms. Dignam had any input into the changes made to the narrative portion of the review or that those changes had any adverse impact on Plaintiff. Thus, Plaintiff fails to show a triable issue of fact with regard to this theory of retaliation. See Scott v. Harris, 550 U.S. 372, 380 (2007) (explaining that for a factual issue to be genuine, it must have a real basis in the record).

### 3. *Plaintiff's Designation as a Witness in the EEO Proceeding*

Finally, Plaintiff attempts to identify additional protected activity by pointing to the fact that Ms. Solloway identified Plaintiff as a witness in September 2012 and that an EEO report was issued in November 2012 that listed Plaintiff as a

comparator in Ms. Solloway's EEO proceeding.[7]  (Doc. 90 at 3-5, 15-17).

Certainly, Plaintiff's participation as a witness in an EEO proceeding amounts to

protected activity.  However, this argument suffers from the same flaws as

Plaintiff's other arguments.  Plaintiff has failed to cite to any evidence that any of

the supervisors— Russell, Dignam, or Foy—was contemporaneously aware of the

November 2012 EEO report or of the fact that Plaintiff was identified as a witness

in Ms. Solloway's EEO proceeding.  Instead, Plaintiff merely argues that the "SEC

should have been aware" of what Ms. Solloway and the EEO office were doing

with respect to Solloway's EEO claim. (Doc. 90 at 4).  A mere assertion that the

SEC or its managers "should have" known a fact is insufficient to establish a

causal connection in the face of unrebutted evidence that the decision maker was

not aware of the protected activity.  See Krutzig v. Pulte Home Corp., 602 F.3d

1231, 1235 (11th Cir. 2010) (knowledge on the part of persons other than the

decision maker cannot be imputed to the decision maker for the purposes of an

FMLA retaliation claim).  Plaintiff's self-serving belief that SEC officials "should

---

[7]     Plaintiff also states that an EEO investigator requested permission to interview Plaintiff in October 2012, citing to Plaintiff's Exhibit 3.  (Doc. 90 at 4). That exhibit is an email dated May 26, 2013 from Ms. Solloway in which Ms. Solloway complains about how the EEO process works.  (Doc. 89-3).  The email, however does not mention Plaintiff and does not support Plaintiff's assertion that an EEO investigator requested permission to interview Plaintiff in relation to Ms. Solloway's EEO proceeding.

have" been aware of his alleged activity is insufficient to withstand summary judgment.

Moreover, as discussed above, even if Dignam and/or Foy were aware of the report and/or of the fact that Plaintiff was named as a witness, summary judgment would still be warranted because: (1) there is no evidence that anyone other than Mr. Russell was the decision maker, and (2) Mr. Russell provided unrefuted testimony that he was not aware that Plaintiff had any involvement in Ms. Solloway's accommodation request or EEO proceeding. (Russell Dep. at 18).

Accordingly, Defendant is entitled to summary judgment because Plaintiff has failed to make out a <u>prima facie</u> case of retaliation.

## B. Pretext

Defendant next argues, and I agree, that there is a second, independent basis for granting Defendant summary judgment. Even if Plaintiff could make out a <u>prima facie</u> case of retaliation, his claim still fails because Plaintiff has not come forward with evidence to show that Defendant's proffered legitimate non-retaliatory reason for giving Plaintiff a negative performance review was not the true reason.

As noted above, Mr. Russell's February 28, 2013 memo indicates that Plaintiff engaged in unprofessional conduct during the rating period and identifies

three incidents during the summer of 2012 as the basis of the "unacceptable" rating for Performance Objective 5. (Doc. 84-6 at 192-193). At his deposition, Mr. Russell reiterated the reasons stated in the memo, provided additional details about the incidents, and testified that he viewed Plaintiff's behavior in June, July, and August 2012 as inappropriate and impeding the mission of the agency. (Russell Dep. at 22-23, 41, 49-54, 86-87).

In his response, Plaintiff provides his side of the story as to each of these incidents and points out that none of these incidents resulted in any discipline. (Doc. 90 at 8-11). He also points to evidence that in September 2012, Mr. Russell noted on two of Plaintiff's individual exam reviews that the "Exam team worked well together; completed assigned review areas; no concerns noted," and that none of the ten exam reviews for 2012 indicated that Plaintiff was having problems with his performance. (Id. at 10). Plaintiff provided evidence that the 2012 PWP stood in stark contrast to his previous performance ratings, as well as his subsequent performance ratings. (Id.). Importantly, however, Plaintiff does not dispute that the incidents in June, July, and August 2012 actually occurred or that they caused Mr. Russell concern.

The evidence shows that in June 2012, Plaintiff did, in fact, have an "unproductive" email exchange with examination manager Robert Cowdin, when

Cowdin directed Plaintiff to "review the comments and make any necessary changes" to a report. (Russell Dep. at 32-26; Doc. 84-2 at 103). The report contained comments in the margins, including that some quoted language be changed to "be summarized in the staff's voice." (Russell Dep. at 34; Doc. 84-6 at 214). Plaintiff responded, "I reviewed PCM. I will not be making any changes." (Doc. 84-2 at 103). Mr. Russell then instructed Mr. Cowdin to communicate back with Plaintiff the expectation that the changes be made, and ultimately, Plaintiff complied. (Doc. 84-6 at 214).

There also is no dispute that the July "politeness" incident occurred. On July 11, 2012, Mr. Russell counseled Plaintiff regarding an email Plaintiff had sent to a coworker. (Russell Dep. at 41-44, 84; Doc. 84-6 at 215). Mr. Russell conveyed his expectation that Plaintiff would be more polite when making requests of his colleagues, including using words such as "please" and "thank you." (Id.). In response, Plaintiff became irate and indicated that the use of such words was inefficient. (Id.). Ultimately, Plaintiff "acquiesced and said he understood and would change his approach going forward." (Doc. 84-6 at 215).

Nor is there a dispute that the August event occurred. On August 3, 2012, Mr. Russell shared with Plaintiff and an exam manager a report provided by the State of Arkansas that was relevant to an ongoing examination that Plaintiff was

working on.  In response, Plaintiff instructed Mr. Russell and the exam manager to contact the Chicago Regional Office and to summarize their findings.  (Russell Dep. at 49-54; Lasseigne Dep at 10-11; Doc. 84-2 at 104-105).  Russell testified that he felt that Plaintiff's response was inappropriate because, in his view, Plaintiff should have been the one to contact the other office.  (Russell Dep. at 52).  Afterwards, Mr. Russell told Plaintiff to plan to meet the following Monday to discuss the incident, and Russell sent Plaintiff a calendar invitation.  Plaintiff declined the meeting request and responded with an email stating, "We will need to have a long, thorough discussion about the so called 'processes'" and that "prior to any meeting occurring," Mr. Russell should provide Plaintiff with an agenda outlining topics and answer a series of questions posed by Plaintiff.  (Doc. 84-2 at 104).

Plaintiff argues that these incidents were all minor and could not form the basis of an unacceptable rating.  The focus of the pretext inquiry, however, is on the *employer*, and whether the employer actually was dissatisfied with the employee for the stated reason; the focus is not whether the employee thought the employer overreacted or could have handled the situation differently.  See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (explaining that the pretext inquiry centers on the employer's belief).  Here, there is no dispute

that the three incidents occurred, nor is there evidence to contradict Mr. Russell's testimony that he was dissatisfied with Plaintiff's behavior in connection with the three incidents. The fact that Plaintiff was not formally disciplined or that Plaintiff might consider the incidents insignificant is not determinative. While Plaintiff might disagree that his performance with regard to Performance Objective 5 was unacceptable, his belief alone is not sufficient to create a triable issue of fact regarding pretext, which requires evidence to rebut each of the proffered explanations for the performance rating. See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (if the proffered reason is one that might motivate a reasonable employer, the plaintiff cannot succeed by simply quarrelling with the wisdom of the employer's decision). The focus of the summary judgment inquiry is on *evidence* of pretext. See Brooks v. Cty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006) (to establish pretext, the plaintiff must "meet the proffered reason head on and rebut it"). Here, there is no *evidence* of pretext; accordingly, Defendant is entitled to summary judgment for this additional reason.

## V. CONCLUSION

For the reasons stated, I **RECOMMEND** that Defendant's Motion for Summary Judgment (Doc. 84) be **GRANTED**.

So **REPORTED** and **RECOMMENDED** this 10th day of May, 2017.

CATHERINE M. SALINAS
United States Magistrate Judge